UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> TIMOTHY M. ROBERTS, ) <br> ) <br> Defendant. ) | Case No.: 8:06-cv-1611-T-23EAJ |

**FIRST AMENDED COMPLAINT
FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission ("Commission") alleges:

**I.   INTRODUCTION**

1.  From November 2004 through February 2005, defendant Timothy M. Roberts, then Chief Executive Officer of Infinium Labs, Inc. ("Infinium Labs"), engaged in a scheme to increase sales of Infinium Labs stock by providing materially false and misleading information to potential stock purchasers concerning the company's prospects while at the same time selling his own shares of the company's stock for personal gain.

2.  To effect this scheme, Roberts hired a stock promoter, Michael Pickens, to distribute reports on the company by facsimile ("fax") to tens of thousands of potential investors across the United States. Pickens's faxes made it appear as if Infinium Labs were on the verge of launching its flagship product, a home videogame system called the "Phantom," when, in fact, the company had postponed the launch of the product because it lacked the financial resources to overcome the significant technological and manufacturing hurdles it faced.

3. Roberts received and reviewed copies of the misleading faxes during the promotional campaign. Instead of putting an end to the faxes, however, Roberts paid and encouraged Pickens to continue. Roberts profited from the scheme by selling approximately $422,500 in Infinium Labs' stock from his personal account, on many occasions without publicly disclosing his sales. In addition, Roberts paid Pickens with shares of Infinium Labs' stock without registering the transfer with the Commission. These activities violated the federal securities laws.

4. The Commission seeks judgment against Roberts enjoining him from future violations of the securities laws, requiring that he disgorge any gain or benefit he received from his past violations of those laws, and imposing a penalty for his violations. The Commission also requests that the judgment prohibit Roberts from serving in the future as an officer or director of a public company and from participating in any offering of penny stock.

## II. THE DEFENDANT

5. Timothy M. Roberts, age 36, lives in Longboat Key, Florida. During the relevant period, he served as Chief Executive Officer of Infinium Labs and Chairman of the Infinium Labs Board of Directors. Roberts, who founded Infinium Labs in December 2002, beneficially owned approximately 25 percent of the company's common stock during the relevant period. Roberts resigned as CEO in August 2005, but remains as the Chairman of the Board of Directors.

## III. RELATED PARTY

6. Infinium Labs, Inc. is a Delaware corporation that currently has its principal place of business in Seattle, Washington. From December 2002 through approximately August 2005, the company was headquartered in Sarasota, Florida. At the time of the conduct described in this

-2-

Complaint, Infinium Labs was a development stage company with plans to market a home videogame console with an accompanying on-line subscription game service.

7.  During the relevant period, shares of Infinium Labs common stock were registered with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78l(g)]. The company was a "penny stock" issuer pursuant to Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1]. Infinium Labs common stock was quoted on the OTC Bulletin Board under the symbol "IFLB."

8.  Also during the relevant period, Infinium Labs filed reports with the Commission pursuant to Section 13 of the Exchange Act [15 U.S.C. § 78m]. The company reported on a calendar year basis, meaning, for example, that its first quarter ended on March 31.

### IV.   JURISDICTION AND VENUE

9.  This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

10. This District Court is a proper venue for this action because defendant Roberts resides in this district and certain of the acts and transactions at issue in this action occurred here. In addition, at the time of the conduct set forth below, Infinium Labs had its principal place of business in this district.

11. Defendant Roberts, directly and indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices and courses of conduct set forth in this Complaint.

## V. DEFENDANT'S CONDUCT

12. Roberts founded Infinium Labs as a start-up company in December 2002. Infinium Labs became a public company, required to file quarterly and other periodic reports with the Commission, following a reverse merger completed in early January 2004. As founder, Chief Executive Officer, and Chairman of the Infinium Labs Board of Directors, Roberts acquired approximately 25 percent of the company's outstanding common stock in the merger.

13. Roberts wanted Infinium Labs to develop and market a new home videogame system. At about the same time as the merger in January 2004, Roberts hired executives with experience in the videogame industry, including a former Microsoft employee who had worked on the Xbox. Roberts intended Infinium Labs' system to license videogames from software manufacturers and to deliver the games over the Internet to home users on a subscription basis. Roberts and Infinium Labs dubbed the nascent system the "Phantom."

14. Infinium Labs attracted a significant amount of publicity for the Phantom at an industry trade show in March 2004. Studies commissioned by Infinium Labs, referenced in the company's filings with the Commission, projected that the Phantom would bring in approximately $35 million in revenue to Infinium Labs in its first 12 months. As a development stage company, however, Infinium Labs had no existing products to generate the capital necessary to fund the Phantom's launch. In light of the potential market for the Phantom, the date for the expected launch of the product was an extremely important event for Infinium Labs and of great interest to its existing and prospective stockholders.

15. For several months following the trade show, Infinium Labs publicly stated that it planned to launch the Phantom system in mid-November 2004. Infinium Labs management, including Roberts, knew that the November target for Phantom was aggressive. Although the

company had built a working prototype of the game console in the spring of 2004, a considerable amount of work remained in order to launch the service on a large scale to consumers. For example, Infinium Labs had not fully developed the software required to stream games over the Internet, nor had it licensed the content for its game catalog or partnered with a retailer to market the system. The process to manufacture (and then ship) the molded plastic Phantom game consoles from China had to be started at least 150-180 days before the date of the launch. The planned manufacturing process was not only time-consuming, but also required substantial up-front capital expenditures.

16. Infinium Labs management calculated that many of the hurdles to the launch of Phantom could be solved if the company raised enough money to hire a sufficient number of developers to work on the technology. In reports filed with the Commission in mid-2004, Infinium Labs estimated that it required approximately $11.5 million to fund the Phantom launch. This figure included the amount needed to manufacture and ship the consoles from China.

17. Roberts assigned himself the role as the company's primary fundraiser. In June 2004, Roberts was introduced to stock promoter Michael Pickens. Pickens said that he could help the company find investors to fund the launch of the Phantom service. Pickens did not find any investors, however, and Roberts lost contact with him by the end of the summer of 2004.

18. Roberts and Infinium Labs failed to secure sufficient funding to launch the Phantom system. In or about September 2004, Infinium Labs management realized that the company could not meet the projected mid-November launch date. On September 23, 2004, in a report filed with the Commission on Form 8-K, Infinium Labs first publicly disclosed that it would not introduce its service until an unspecified time in 2005. In its report for the its third

fiscal quarter ending September 30, 2004, filed with the Commission on Form 10-QSB on November 23, 2004, Infinium Labs subsequently estimated that the launch of Phantom would not occur until the company's fiscal quarter ending June 30, 2005.

19. In addition to delaying the Phantom launch, the funding shortfall meant that Infinium Labs could not meet payroll. In or about September 2004, the company started paying its employees with company stock instead of cash. Roberts, who was experiencing his own financial problems at the time, was similarly paid in Infinium Labs stock in lieu of cash compensation. In November and December 2004, Roberts received 500,000 shares of Infinium Labs stock as compensation for his services. Roberts did not file public notices of the stock grants on Forms 4 with the Commission, as required.

20. In or about early November 2004, Roberts and Pickens became reacquainted. Pickens offered to promote the purchase of Infinium Labs stock in a "fax campaign." Roberts agreed to the proposal. On November 8, 2004, Roberts asked Pickens to "start today."

21. Pickens began the fax campaign on November 9, 2004, sending tens of thousands faxes through a "fax blasting" company based in Miami, Florida intending to attract potential investors. The faxes were transmitted from computer servers in Miami to fax machines across the United States. The initial campaign continued through November 19, 2004. Pickens sent additional faxes on December 14 and 16, 2004. Beginning on December 23, 2004, Pickens sent faxes periodically through January 2005. The last faxes were transmitted from February 1 to February 3, 2005.

22. The faxes contained false and misleading statements, described further below, about the timing of Infinium Labs' planned launch of the Phantom, the prospects for the value of its stock, and the company's management.

23. The faxes sent from November 9 to November 19, 2004, falsely asserted that "Infinium Labs management has done the work to make sure that the product launch is 100% successful in January 2005. That is only a few weeks away from now and the stock is trading at a fraction of its true value." During the period in November when the faxes were sent to potential investors, Infinium Labs had no plans to launch the Phantom system as early as January 2005. According to its internal projections, because of the financial, manufacturing, and other technical hurdles, a January 2005 launch date was not feasible at the time the faxes were transmitted. By claiming that the company "has done the work" and that "the stock is trading at a fraction of its true value," the faxes misled potential investors concerning the significant obstacles to launch of Phantom.

24. The faxes sent in December 2004 and later contained similar misrepresentations about the company's business plans. The faxes falsely stated that "Infinium Labs management has done the work to make sure that the product launch is 100% successful in the 1st qtr of 2005. That is only a few weeks away from now and the stock is trading at a fraction of its true value." At the time that the faxes were sent to potential investors, Infinium Labs had no plans to launch the Phantom system by the end of its first fiscal quarter ending March 31, 2005. The financial, manufacturing, and other technical hurdles precluded the launch of the Phantom by the end of March 2005. By claiming that the company "has done the work" and that "the stock is trading at a fraction of its true value," the faxes misled potential investors concerning the significant obstacles to launch of Phantom.

25. All of the faxes sent during the promotional campaign contained "price targets" substantially above the then-current trading price for Infinium Labs stock. The price targets corresponded with the purported date of the Phantom launch, according to the faxes. The faxes

sent in November 2004 projected that the Phantom would be launched in January 2005, and contained corresponding January price targets. For example, the faxes sent on November 9, 2004, projected a January 2005 launch of the Phantom system. The faxes included the following chart: "Price Target—3 Month $4.50*". A note following the asterisk asserted: "IFLB will be $4 + by January—an increase from today's price of 1379%". At the time that the faxes were transmitted, Infinium Labs stock was trading at about 29 cents per share.

26. Similarly, the faxes sent in December 2004 and later projected that the Phantom would be launched by the end of the company's first fiscal quarter in 2005. All of the faxes contained corresponding March price targets. Faxes sent on January 26, 2005, for example, included the following chart: "Price Target—3 Month $10.50*". A note following the asterisk asserted: "IFLB will be $6 + by March—an increase from today's price of 3000% +". The faxes continued, "This is the most incredible opportunity of 2005, and you can begin to take profits next month because the stock will triple in value in the next 30 days." At the time that the faxes were transmitted, Infinium Labs stock was trading at about 55 cents per share.

27. The price targets were based on the false and misleading assertion that Infinium Labs "has done the work" to launch the Phantom system. None of the price targets had a reasonable basis in fact. Indeed, the company's distressed cash flow and its inability to bring the Phantom to market indicated a contrary trend.

28. All of the faxes sent during the promotional campaign contained a chart showing the number of Infinium Labs shares outstanding and the company's "public float." According to the faxes, Infinium Labs had "27.2 million" shares outstanding and a "1.7 million" public float. These figures were false. During the relevant period, more than 100 million shares of Infinium Labs common stock had been issued and were outstanding. The vast majority of the company's

outstanding shares were publicly traded and not held by the company's management. By grossly understating the true numbers, the faxes greatly magnified the potential effect of the Phantom launch on the value of Infinium Labs stock.

29. Finally, the faxes sent in December 2004 and later asserted the following: "Infinium hires former Microsoft X-Box developer to head company" and "Infinium brings former Microsoft X-Box developer as CEO." These assertions were false. The Chief Executive Officer of Infinium Labs—Roberts—had never worked at Microsoft.

30. Public trading in Infinium Labs stock surged significantly in the days immediately following the transmittal of the faxes. For example, the volume of shares traded during the period November 9 to November 19, 2004, was 64 percent higher than all other days in November when Pickens did not send faxes. Employees of Infinium Labs, who had been paid in company stock, were able to sell their shares in the public market as trading volume increased.

31. Roberts, who had authorized Pickens to conduct the fax campaign to promote Infinium Labs' stock, received complaints about "junk faxes" from recipients of the faxes. The complaints to Roberts began on the first day of the fax campaign, November 9, 2004. Roberts told those who complained, and other members of Infinium Labs management, that he did not know who had sent the faxes and that Infinium Labs was not responsible.

32. Although Roberts did not personally draft the faxes, he received copies of the faxes from some of those who complained. Roberts received at least two copies of the faxes in November 2004; at least one copy in December 2004; at least one copy in January 2005; and at least one copy in February 2005. Roberts reviewed the faxes on or about the dates that he received them. From his review of the faxes, Roberts knew or was extremely reckless in failing to determine that the faxes contained misleading price targets for Infinium Labs stock and

inaccurate figures for the numbers of shares outstanding and the company's public float. He also knew or was reckless in failing to determine that the faxes incorrectly stated that the Infinium Labs CEO was a developer of the Microsoft Xbox. In addition, he knew or disregarded with extreme recklessness the timing of the purported Phantom launch as they appeared in the faxes.

33.     Even though he received and reviewed the faxes, and knew about or disregarded the faxes' misleading content, Roberts did not stop Pickens from continuing the promotional campaign. On the contrary, Roberts communicated with Pickens in December 2004 and encouraged him to send additional faxes. Roberts also ensured that Pickens was paid for his work. Despite the company's poor cash position, Roberts wired Pickens $100,000 from an Infinium Labs bank account on December 17, 2004. On December 20, 2004, and again on December 31, 2004, Roberts wrote checks to Pickens totaling $100,000 from an Infinium Labs bank account.

34.     In addition to the cash payments, Roberts paid Pickens in stock. On December 31, 2004, Roberts transferred four million shares of restricted Infinium Labs stock from his personal holdings to Pickens. No registration statement was in effect with respect to the stock transfer, and Roberts did not register the transfer with the Commission.

35.     Pickens gave notice of his intent to sell portions of the shares by filing Forms 144 with the Commission on or about January 28 and March 14, 2005. Between mid-February and mid-May 2005, Pickens sold in the open market approximately 700,000 shares of the restricted Infinium Labs stock that he had received from Roberts. Pickens received approximately $179,000 from the public sales. No registration statement was in effect during the period when Pickens sold the stock.

36. Roberts personally profited from the promotional fax campaign by selling shares of Infinium Labs stock. Roberts sold the 500,000 shares of stock that he had received in lieu of cash compensation in November and December 2004 for approximately $123,000. Most of the proceeds—approximately $92,500—came from sales following the start of the promotional fax campaign on November 9, 2004. Roberts did not file notices of his stock transactions, as required, on Forms 4 with the Commission.

37. In late January and early February 2005, aware that Pickens was continuing to send the misleading faxes, Roberts sold 822,000 additional shares of restricted Infinium Labs stock from his personal holdings. He received approximately $330,000 in connection with the sales, which he disclosed on Forms 4 filed with the Commission.

## FIRST CLAIM

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**(False and Misleading Statements in Connection with the Purchase or Sale of Securities)**

38. Paragraphs 1 through 37 are re-alleged and incorporated by reference.

39. From November 2004 through February 2005, defendant Roberts, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce, by use of the mails, and by use of a facility of the national securities exchanges, and with scienter: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

40. Defendant Roberts, by such conduct, violated 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 and, unless enjoined, will continue to engage in such violations.

## SECOND CLAIM

**Violations of Section 17(a) of the Securities Act**
**(False and Misleading Statements in Connection in the Offer or Sale of Securities)**

41. Paragraphs 1 through 37 are re-alleged and incorporated by reference.

42. From November 2004 through February 2005, defendant Roberts, directly or indirectly, in the offer or sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce, and by use of the mails: (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

43. Defendant Roberts, by such conduct, violated 15 U.S.C. § 77q(a) and, unless enjoined, will continue to engage in such violations.

## THIRD CLAIM

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Unregistered Offer and Sale of Securities)**

44. Paragraphs 1 through 37 are re-alleged and incorporated by reference.

45. From November 2004 through May 2005, defendant Roberts directly or indirectly, by use of the means and instruments of transportation and communication in interstate commerce, and by use of the mails, offered to sell and sold certain securities as to which no registration statement was filed with the Commission and was in effect.

46. Defendant Roberts, by such conduct, violated 15 U.S.C. § 77e(a) and 15 U.S.C. § 77e(c) and, unless enjoined, will continue to engage in such violations.

## FOURTH CLAIM

### Violations of Section 16(a) of the Exchange Act and Rule 16a-3 thereunder
### (Failure to File Notices of Stock Transactions)

47. Paragraphs 1 through 37 are re-alleged and incorporated by reference.

48. From November 2004 through June 2005, defendant Roberts was an officer and director of Infinium Labs and, directly or indirectly, a beneficial owner of more than ten percent of Infinium Labs common stock.

49. From November 2004 through June 2005, defendant Roberts failed to file statements accurately reflecting changes in his beneficial ownership of Infinium Labs common stock and annual statements accurately reflecting his beneficial ownership of Infinium Labs common stock.

50. Defendant Roberts, by such conduct, violated 15 U.S.C. § 78p(a) and 17 C.F.R. § 240.16a-3 and, unless enjoined, will continue to engage in such violations.

## RELIEF REQUESTED

The Commission respectfully requests that the Court:

### A.

Enjoin defendant Roberts from engaging in future conduct in violation of 15 U.S.C. § 77e(a), 15 U.S.C. § 77e(c), 15 U.S.C. § 77q(a), 15 U.S.C. § 78j, 15 U.S.C. § 78p(a), 17 C.F.R. § 240.10b-5, and 17 C.F.R. § 240.16a-3.

### B.

Order defendant Roberts to disgorge all benefits that he obtained from his violations of the securities laws, with prejudgment interest.

**C.**

Order defendant Roberts to pay a civil penalty.

**D.**

Prohibit defendant Roberts from acting as an officer or director of an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or required to file reports pursuant to Section 15 of the Exchange Act [15 U.S.C. § 78o].

**E.**

Prohibit defendant Roberts from participating in any offering of penny stock.

**F.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated this 14th day of May, 2007.

By: _____
Helane L. Morrison
Robert L. Tashjian
Securities and Exchange Commission
44 Montgomery Street, 26th Floor
San Francisco, CA 94104
(415) 705-2500

**CERTIFICATE OF SERVICE**

I, Edwina R. Alcairo, am a citizen of the United States, over 18 years of age and not a party to this action. I caused to be served by E-Mail the attached FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF to Defendant's counsel.

I declare under penalty of perjury that the foregoing is true and correct. Executed at San Francisco, California on May 14, 2007.

*Edwina R. Alcairo*
Edwina R. Alcairo
Legal Technician